Oral argument not to exceed 15 minutes per side, Mr. Counsel West for the Plaintiff-Appellant Cross-Appellee. Good morning, may it please the Court, Counsel. My name is Kevin West and I represent the Appellant EQT Production Company. We would respectfully request that the Court reverse the partial summary judgment and final judgment of the District Court and remand the case for a new trial. We would like to reserve three minutes for rebuttal, please. Court, please, this case involves the interpretation and performance of 11 farm-out agreements. A farm-out agreement is in essence the same as a lease. So for that reason, particularly with regard to the trial court's summary judgment on natural gas liquids, this decision, whatever decision is made, will have impact not just on EQT and these are two substantial companies that negotiated a contract, but it will have impact upon landowners who have entered into leases with producers also. Because as I said, a farm-out agreement is essentially the same as a lease. What it does is it grants a right to produce, in this case, oil, gas, and natural gas liquids in exchange for payment of a royalty. There's no right to produce the oil, the gas, or the natural gas liquids without the farm-out agreement, or in the case of a landowner, without the lease. Just like certainly someone who has an oil and gas lease cannot produce coal or limestone because they have the lease. Just because without the right to produce the natural gas liquids through these farm-out agreements, Magnum Hunter would not have had the right to produce natural gas liquids. As I said, these rights are granted in exchange for a royalty payment, just the same as you would in a lease. In this particular case, the farm-out agreements all provided that the royalty would be paid based upon gross proceeds without deduction of any kind. But the lease did not in any way specify or say anything about the market and price calculation for the royalties, did it? It did, Your Honor. For instance, I know this court has dealt in the Appalachian land case with a market value lease which was silent about whether or not you could take deductions. What the court said in that case, and what the Kentucky Supreme Court said in Baker v. Magnum Hunter, is if you have a lease with a royalty provision which is silent with regard to how you calculate royalty, then you do apply this default rule which allows for the deduction of certain transportation, compression, things like that, processing cost in calculating the royalty. But what, for instance, in the Baker v. Magnum Hunter case, the Kentucky Supreme Court case, the court very clearly pointed out that if you have a contract between parties that specifies the manner in which the royalty is to be calculated, then this default rule does not apply. So in this particular case, it's very clear under each of the 11 farm-out agreements that royalties are to be based upon gross proceeds without deduction of any kind. So it's clear by reverting back to this default rule that you just talked about, because it seems to me that in this entirely foreseeable circumstance, that the parties would set out with as much definiteness as possible, all of the particulars, and as you've explained, construing some other law, that it's like you're referring to a court ruling to give guidance where the contract could have simply supplied in a more meaningful way the dictates, the outcomes, and all of these other consequences. Well, Your Honor, with regard to the royalty provision, I think that it is clear. It says gross proceeds without deductions.  There was never any dispute with regard to natural gas royalties that deductions could not be taken. Magnum Hunter has never made that claim at all during the audit or during this litigation. It's very clear deductions cannot be taken. Where I guess the dispute arose was with regard to natural gas liquids. What had happened, there's just one well that produces the gas, the oil, and the natural gas liquids. There's not separate wells that produces each of these products. And up until 2008, all that was produced was the gas and it was sold. This is wet gas, which means it's high in heat content, so that whenever it was sold, it was sold based upon its heat content. And frankly, before 2008, Magnum Hunter and then the royalty owner were getting paid for the natural gas liquids as part of the gas price. But then in 2007, the Federal Energy Regulatory Commission entered some new rules as far as the heat content that you could put into an interstate gas pipeline. So for that reason, then Magnum Hunter built this processing plant and began deducting processing costs for the production, for separating out that natural gas liquids from the gas. The concern is we understand how you got to that position because of the changed rules. But I'm struggling a little bit, and I want to make sure I've got it right, with this Poplar Creek development, the Appalachian LLC from our circuit in 2011. There, the discussion was about gross, and gross meant without deductions. There was determined to mean, so how do we meaningfully distinguish between gross income received as it was explained in Poplar Creek and proceeds received without deductions of any kind, which is the language in your contract? In other words, don't you fit within the explanation of Poplar Creek? Please, I don't believe we do, particularly with regard to the gas royalty payments, because it's very specific in the contract that was executed between these two parties that there were not to be any deductions of any kind in calculating the royalty. Well, isn't that what Poplar Creek addresses? If gross means without deductions, and you say proceeds received without deductions, wouldn't it mean that if Poplar Creek said that still means you get to deduct some portion, wouldn't the same thing apply to you? No, Your Honor, I don't believe that. Why not? Why would the way those words have been interpreted not result in a comparable answer in your case? Court, please, I believe if you look at the language in these 11 farm-out agreements, there is a direct prohibition against deduction of any cost, and the parties, there was never any dispute with that regard, particularly with regard to the natural gas royalties, that they could not deduct compression and transportation. In fact, as part of the 2013 audit process, they agreed to refund to EQT the deductions that were made on the gas royalties, because the dispute there was not the gas royalty. There's never been any dispute that you could not deduct with regard to the gas royalties, and that's what the district court's decision was. The only reason damages were not awarded with regard to the gas royalties was there was this dispute about what damage evidence could come in at trial. So we believe that that's very clear. The dispute has always been with regard to the natural gas liquids, and what the trial court held is that the reason processing costs could not be deducted is that the court said that the farm-out agreements did not apply to natural gas liquids. They only applied to gas and oil. And as we've pointed out in our briefs, we don't believe from a practical or a legal standpoint that makes any sense, because without these farm-out agreements, there would be absolutely no right for Magnum Hunter to have produced natural gas liquids. Just like with a lessor that has a lease with Magnum Hunter or some other producer, their only right to produce any product emanates from the granting document. I understand this is an area of expertise in which I do not have a lot of experience, so I'm looking to both of you to educate me. What I'm struggling with is that we look back at Lafitte, which talks about gross income received by the lessee, and I understand that that's different from the exact language in yours, but gross means gross. It means without deduction, and yours specifically says without deduction, so it seems to me that those two things are linguistically comparable, and yet we said that the post-production transportation costs were at issue there could be deducted from a royalty calculated from the gross income received. So try me again, because I'm missing something. Why is that not the same situation as yours, subjecting you to at-the-well rule? Because in that case, Your Honor, it says gross proceeds, but it doesn't get into the specific prohibition against the deductions. But what does gross mean? Well, I think that's Gross means without deductions, right? And if the Court, please, if you look at the authority, not just in this circuit and in Kentucky, but across the nation, whenever you have the dispute arises is if it's silent, if there's no specific reference to no deductions can be taken. Even in a state like West Virginia, which follows the markability rule, where there's a presumption that you can't take deductions, if a lease says you can take deductions or it says there are not to be any deductions on either of those situations, the controlling language of the lease is what is applied. For instance, if it says deductions are prohibited, they are prohibited by means of contract, not by the application of the markability rule. So if the Court, please, we believe that the default rule only applies where a lease is silent with regard to whether deductions can be taken or not. And in a situation where a contract says that they're prohibited, that the contract of the parties applies. So for that reason, we would ask that the Court reverse the decision of the trial court. Thank you. When you return, I'd like you to just, in your rebuttal time, say something about sanctions and the how factors. Yes, thank you, Your Honor. May it please the Court, Anne Chestnut here for Magnum Hunter, the appellee in this case. This case is an unfortunate example of when a legal discussion gets completely divorced from the facts of what actually happened in the case. And I'm not just talking about the argument or the brief here, but the corporate representative at trial for EQT was its litigation manager. The corporate representative at the deposition for EQT when we wanted to know about damages was a lawyer who was hired to try to explain those, and, in fact, he couldn't. I would urge the Court to go back and look at what happened in this case, the actual factual record of this case, because the chronology and what happened is just so important. And it doesn't affect, as Mr. West was saying, well, this would affect everyone in the world that has a lease. This case is about these parties and what they did, and that's the way that this case should be decided. It doesn't call for any sweeping pronouncements of whether gas means liquid, as they tried to argue below. It does, but it does place itself right in the middle of this unusual set of cases that define from, I think, Lafitte to Poplar Creek and including Baker. So educate us again on exactly what you think can or can't be deducted and how that fits with the existing case law. Yes, Your Honor, and to some extent I agree with what Mr. West said as far as the existing case law and what the Court has recognized. Poplar Creek, Baker, all those cases that we were both involved in, I argued Baker case to the Kentucky Supreme Court. And what the Kentucky Supreme Court said was what this Court had predicted in Poplar Creek and anticipated, and said that if the lease is silent, or here the farm-out agreements are silent as to the calculation of royalty, then the default position under Kentucky law clearly is that you can take out from that gross that the Court stuck up on, take out from that gross the post-production expenses. And sometimes that's called a net-back, a work-back theory. On page 29 of our first brief, Your Honor, document 32 in this Court, we have an example of a sales price minus post-production cost, and that's the work-back method. That's allowed when there's no royalty calculation, and that was true for this case for NGLs, for the liquids involved. And the reason for that, again, going back to the chronology, is from the time that these agreements were entered into back in 1996, no NGLs, no gas liquids, no liquids were being produced. It was simply gas. The same thing was true even after the last, you know, there are 11 agreements, as the Court knows, in the complaint, the first 11 exhibits. During the year 2004, the last agreement is signed. There's still no NGLs being produced anywhere. It wasn't on their minds. It's not in the farm-out agreements. It's not discussed because it wasn't happening. It wasn't being produced. Even in the period from 2004, the last farm-out agreement, exhibit number 11. So how does that play out? I understand your argument. We didn't think about it. We're not addressing it. So how does that play out with the law? And the way that it plays out with the law, Your Honor, is exactly what the Court has focused on up in Poplar Creek and Baker and these other cases. If it's not on your mind, if you haven't calculated, if you haven't provided in the farm-out agreements, and they do not, the calculation of royalty on something that was not even being produced in the 18 years before this comes up, then the default position, quite simply, is, yes, you can take the post-production expenses. That's what we did. It was exactly what Baker and Poplar Creek, that's what Magnum Hunter did. It's allowed under Kentucky law. But more importantly to this case, it's what the parties agreed upon. Because when that first order came that the Court mentioned in 2007, when this issue did arise, and it was on everyone's minds, Magnum Hunter said, we've got a solution. EQT's gas could not go into the interstate pipeline at that point. Magnum Hunter said, we can solve that by creating, building a processing plant. We can get your gas lowered so that it can be produced. That's considered pre-production costs, all of this construction. I'm just trying to make sure I understand the distinction between post-production and the drilling and the creation. And, Your Honor, on that point, what Mr. West was trying to argue, and, again, this is where I think the legal argument's completely been apart from the facts. He's trying to say, well, there's just one well that produces all this stuff. The NGLs are somehow part of the gas back at the well. That's not accurate. What happens is the NGL's a new product, that its post-production expenses are different than the post-production expenses on gas. If you're only talking about gas, we weren't taking those. We agreed with that. That's why I was saying agree with part of what he says. But the NGL was a new product that required new infrastructure, new building. We were able to take post-production expenses just on the NGLs, not on the gas. I hope, again, you're going to have to educate me. Where does the pre- Is everything post-production? It's not because the Lafitte was post-production transportation costs. The creation of the mechanics that you did to divide this out of the existing gas, is that pre-production costs? That's post-production as to the NGLs, Your Honor. And, again, we did not take any- Everything. Your position is everything is- We did not take on-right. Transportation, all those are examples of in the various cases. Sometimes it's with timber, Your Honor. Here's a good example in this courtroom. Kentucky law, the same law says for natural resource, whether it's coal or timber, if you have to take it off property and do something with it, there are going to be post-production expenses involved, and they might be transportation or whatever. The best way to look at this case would be to look at this podium or the bench. When we agreed, if this had been timber, someone agreeing that they're going to take timber off your property does not mean that they're going to build a furniture factory to build everything that's in this courtroom. On a molecular level, it may be identical. Maybe this is exactly like the timber from which it came, but that's not what the parties agreed upon back when- If it had been timber, that's what the parties were agreeing upon was we're going to take the timber off, send your timber to market, not build a furniture factory, not build benches and podiums. That NGL is a completely different product. And another way of looking at that, again, I think the- If we had taken- If someone orders ten units of butane, for example, which is an element of gas, and we just deliver them all kinds of natural gas and just say, there, it's in there somewhere, that's not going to satisfy a contract. It's a different product, and it's a product that was not covered by the farm out agreements. As far as how the calculation of royalty would be, the default position, of course, under Kentucky law, clearly, as the court recognizes, is you can take those. That's what we did. That's what we told EQT we were going to do. We walked them through it before- There's some argument that that was explained and agreed to. Is that- Yes. That was the uncontroverted testimony. Mike Wallen from Magnum Hunter testified, and no one controverted that. He met with EQT. They had periodic meetings. This is years of relationship. They would meet regularly. When this FARC problem came up, Mike Wallen walked them through the plan to process the gas, here's how we're going to do it, and, in fact, did exactly that. The processing plant was built. EQT sat back and was fine with that. EQT enjoyed the benefits of its gas still being able to go to market because it went through a processing plant where the gas comes out without any post-production expenses and a new product. A new product, the liquids come out, go to a different market, and from that we did take post-production expenses. We showed that to EQT for six years. Again, the chronology is important. They accepted that and were fine with it. Let me just stop you for a second. Going back to the post-production cost, you're saying it's post-production from the object of the contract, even though it's something that has to occur before the natural gas liquids are available to send off and do whatever needs to be done. So that's why it's post-production from the original subject of the contract. Is that right? Your Honor, I don't think anything to do with the natural gas liquids has nothing to do with the gas. I understand that. Okay. I'm sorry. When we talk about post something, it normally means after something rather than pre meaning before. Clearly the transportation of the liquids, that's clearly understandable. But when we talk about, I guess, the line of demarcation, if you can look at it that way, we're defining post here as sort of interior to the subject of the original contract because the natural gas liquids, as you say, people weren't really thinking about that when they formulated the contract. Exactly, Your Honor. I don't understand how you're using post here. And, Your Honor, that's exactly right. What the parties were thinking about when they entered into the contract were the gas and what's associated with gas. What they're thinking about when the first order comes up is we've got a new product. The natural gas liquids, it does go to a different market. The transportation is different. Where it's going, whether it's down to New Orleans or being shipped somewhere, it's a different product, a different market. And the extraction and the compression costs, those are different thanó Right. Yes, okay. Well, I think of the law it's treated, Your Honor, as everything that's associated with the NGLs. And, again, that's the way the parties treated it. And I think that that's so important because the parties understood that. Whether I'm not any more of an expertó If we agreed with your argument, does there need to be a remand for calculation of damages? Or is your position that you've paidó that the audit shows that you've paid everything that's due? What is your position on how to make that calculation? To make which calculation? If we rule that the royalties were owed and that you can deduct processing costs, would that require a remand for calculation of damages? Your Honor, I don't believe any remands would be required under any circumstances for this reason. The court will recognize we went to trial on three issues. And one were the pre-audit claims. We did not owe for that, so that's not paid. The audit claims, the proof showed we fully paid those. So the only thing that was left is as it came out of the suspense and the accounting for that, we did pay that judgment. So a judgment was entered against us, we immediately paid it. If we prevail, as we would hope we would, it would be simply a matter of EQT returning that money to us. We think the district court should be affirmed on all of the decisions it made, other than the mathematical calculation that I've put in for my credit. And that's what we ended up paying. But as far as the other issues, Your Honor, certainly no remand would be appropriate, no reversal would be appropriate. What the district court did, a large part of what they were arguing in their brief, the district court did under a highly deferential standard that we hope this court will recognize that there's no abuse of discretion in the decisions that the court below made. As far as this NGL question and the calculation for that, that was known to be a $607,000 question. But the NGLs, as it's gone forward, I do not believe that would require any kind of calculation for that. A dollar value was put upon it. But most importantly, the parties did this for six years. And as the case law, as the court said in Lafitte, and both in the district court's decision in Lafitte and the Sixth Circuit's opinion in Lafitte, said that when parties, it's so much like this case, because the court in there even says, well, you know, the auditors were free to go visit the home office and they did that. That's just like here. Audits could be taken, audits were taken, nothing ever comes up for all the time period that goes on. So we think that's really important. I see that I'm getting to my last minute, so I feel like I need to just sum up and say again that this is not a case that calls for some kind of sweeping pronouncement of whether the word gas always contains liquid. We know that's not right. And we know that's not right for the reasons shown in the brief, but more importantly, we know it's not right for the way that the parties treated it. This is a case for recognizing how hard the district judge and the magistrate judge worked on this case, how appropriately they exercised their discretion in evidentiary rulings and in discovery rulings, and how there's... I think we have that, but tell me quickly why the 2002 to 2010 claims are time-barred. Yes, Your Honor, and they're both time-barred, but they also were excluded under the discretionary orders of the court, both on discovery and the entire...how carefully they looked at that. And again, I would hope that this court would respect and honor what the district court did below and also respect and honor what these parties did. These parties knew exactly what those NGL costs were, how it was going to be treated, and this only came up. As an afterthought, a legal argument is completely divorced from any facts. We would ask the court to affirm the district court, accept our credit and the prejudgment interest and the other things we've raised in our cross-appeal. Thank you, Your Honor. Thank you. May it please the court, counsel. Judge Donnell, I'll address your question first during my initial argument. With regard to the 2002 to 2010 deductions and the application of Howe and Baker Hughes by this court, we do believe that the district court abused its discretion. Certainly, was there a mistake as far as should have some information been provided sooner? Yes, it should have. That's my fault. That's not my client's fault. But the important thing about that is there was no surprise or prejudice to Magnum Hunter because these figures that were part of the inertia data that was excluded, whenever Magnum Hunter was the party that calculated and paid royalty, so contemporaneously with the production of the natural gas between 2002 and 2010, they would send a check or a wire and a statement saying this is the payment that was made and these deductions were what was taken in calculating that payment. EQT then took that same information and then inputted it into this inertia accounting data system. So certainly Magnum Hunter knew what was in it. It was a mirror image of these royalty statements that they had provided. So there certainly was no surprise to them. Also there was no surprise because the amount that was claimed for the deductions between 2002 and 2010 was specified in the proof of claim that was filed in the 2015 bankruptcy. So they clearly knew about that. So that's one aspect. Secondly, in addition to excluding the inertia data under the discovery sanction, the district court also excluded evidence that they produced. It was not evidence that EQT had. We had consistently over the course of this litigation requested that they provide to us a summary of the deductions that they had taken and the payments they had made between 2002 and 2010. Ultimately the district court did order them to do that and they did within a few days they were able to generate for the period between 2006 and 2010 all of the deductions that were taken for farm outs other than the ones that the court had ruled was time barred and that was like $1.2 million. So they've conceded, I think my learned counsel conceded in her argument that they knew that they couldn't deduct for gas, post production expenses for gas and they provided the information from their records as far as what that was, less than $1.2 million, but yet the district court expanded its ruling with regard to the discovery sanctions and excluded that. We believe that that should have been included. The court asked about the contractual time bar. I just want to mention that very briefly is that if you look at the record, their own witness, their corporate representative, testified that that contractual limitations only applied to working interest payments, not royalty interest payments like were at issue in this case. Thank you. Other questions? Thank you. Your arguments will be taken under advisement and an opinion will be entered in due course. We thank you. Thank you. This is Judge Keith. Oh, I'm sorry. Judge Keith, did you have a question? Not at all. I just wanted to let the lawyers know that I listened to everything they said and that I am here in Detroit sort of unable to get around as much as I used to at 96 years of age, but I want to congratulate the lawyers for an excellent job that they did, and I wanted to thank you, Judge Straits, and you, Judge Donaldson, for allowing me to hear this case by video, and I just wanted to let the entire court know that I appreciate all of the kindness you've extended to me, and thank you very much. Thank you, Judge Keith. Thank you, Judge Keith. It's good to see you. You may call the next.